(83 South. 197)

No. 22082.

BUCKLEY v. GERATY.

(Nov. 3, 1919.)

*(Syllabus by the Court.)*

1. PARTNERSHIP ⬤⟶118, 119 — ACTIONS BETWEEN PARTNERS; PETITION FOR RECEIVER AND INJUNCTION.

Where a partnership is created for the raising and selling of cabbage plants at a particular place, in the name of one of the partners, and gets its business exclusively (or nearly so) by means of mail orders, a threat by him whose name is so used to remove the business and mailing list to another state, followed by an order which stops the delivery of the mail addressed to him, but intended for the partnership, is sufficient to authorize an application for a receiver and liquidator, and a writ of injunction prohibiting such threatened action.

2. PARTNERSHIP ⬤⟶119 — ACTIONS BETWEEN PARTNERS; WAIVER OF OBJECTIONS TO APPOINTMENT OF RECEIVER.

Where a receiver and liquidator for a partnership is appointed by an ex parte order, in a suit for the dissolution and liquidation of the partnership, and the defendant answers, and there is a protracted trial on the merits, it is too late thereafter, in the argument, to make the objection, for the first time, that defendant had not been given an opportunity to be heard upon the question of the appointment, before it was made.

Appeal from Twenty-Ninth Judicial District Court, Parish of Plaquemines; R. Emmet Hingle, Judge.

Action for an injunction, etc., by Charles W. Buckley against James Ray Geraty. Judgment for plaintiff, maintaining the injunction, confirming the appointment of the receiver and liquidator, and rejecting defendant's demands in reconvention, and defendant appeals. Affirmed, with directions as to costs.

Oliver S. Livaudais, of New Orleans, for appellant.

John Dymond, Jr., A. Giffen Levy, and A. G. Williams, all of New Orleans (R. J. Weinmann, of New Orleans, of counsel), for appellee.

Statement of the Case.

MONROE, C. J. On February 10, 1915, plaintiff presented a petition to the district court representing that defendant and himself were partners, engaged in the business of raising and selling cabbage plants, upon his "Harlem" plantation, in the parish of Plaquemines, under the firm name of "James Ray Geraty," and that, by reason of the acts of defendant (which are set forth at length), evincing an intention to abandon the business as established and remove it to another state, where it would be subject to his exclusive control, and thereby inflict irreparable injury on plaintiff, it had become necessary that he should be restrained by injunc-

tion, and a receiver and liquidator appointed, and ex parte orders were made to that effect—the defendant being enjoined, personally or through agents, from removing any of the assets of the partnership from its place of business, from disposing or attempting tó dispose of the same to the prejudice of the partnership, from taking the mail addressed to the firm of "James Ray Geraty" from the post office, from transferring the business of the firm from Harlem to "Yonge's Island," S. C., from collecting or diverting the debts due to the firm, and from interfering with the receiver and liquidator in the conduct of its business.

Defendant filed exceptions of no cause of action, nonjoinder of proper parties and vagueness of allegation, but, without invoking any ruling thereon, answered to the merits, denying the allegations of the petition, alleging facts at variance therewith, and claiming damages in reconvention, and after a protracted trial, the taking of much testimony, and argument by counsel, there was judgment for plaintiff, maintaining the injunction, confirming the appointment of the receiver and liquidator, and rejecting defendant's demands in reconvention, and he prosecutes this appeal from that judgment. The facts, as we find them, disclosed by the record, are as follows: Plaintiff, Charles W. Buckley, resides near and is engaged in business in Chicago, but has interests in Louisiana, including "Harlem Plantation," in Plaquemines parish, which in 1913, and for a few years prior thereto, was in course of development under the management of his son, Warren Buckley, who had studied the science of agriculture at Cornell University and elsewhere, and represented his father, with full authority, general and special (and, as his authority is not here called in question, it will be understood that, unless otherwise stated, when, in this opinion, we refer to the "plaintiff" as having agreed or contracted with defendant, we mean Chas. W. Buckley, though he may have acted through his son).

In the summer of 1913, there came to Warren Buckley, at Harlem, the defendant herein, who represented that he was a member of the Geraty family of Yonge's Island, near Charleston, S. C. (widely known as raisers and dealers in cabbage plants), and suggested reasons why that business could be made profitable at Harlem, which suggestions having been favorably considered, and defendant having returned to "Yonge's Island," the following correspondence ensued, from which (supplemented, to some extent, by verbal understandings) there resulted a partnership between plaintiff and defendant to wit:

In letter of July 5, 1913, defendant writes about railroad and express tariffs, and further (in part) as follows:

"It is time to place order for seeds, and I am giving order for 200 pounds, to be planted at Harlem, of select seed. In going over your place with your overseer, I showed him the piece of land I would like to have for planting the seed. * * * It would be best to have the cow peas plowed under, and if you will do this, have it done by the 15th of August or 1st of September, and, after they are plowed under two weeks, have about 500 pounds of oyster shell lime per acre applied to the land. * * * I will be down about the 1st of October, to start planting the seed. The first season is only to test out the business; each of us is to put in equivalent of $400, if same be needed. I am to sell and grow the plants; put my experience against the rent of the land and the mule work; the acreage to be small the first year. How about the salary for the time that I put in; will one-third of the profit of the first year business be satisfactory to you, as the salary allowed to me; if there is no profit, I get no salary. * * * You will see on my stationery that I give Montgomery, Ala., as one of my addresses; I tried growing there last year, but it was too far north to get them started."

Replying, in letter of July 12th, to that above quoted, Warren Buckley criticizes the terms suggested by plaintiff, and concludes as follows:

"You evidently overlooked the fact that my time and that of a foreman, together with the knowledge of climate and conditions, seem, at least to us, to be of some value, and we will be growing the whole crop, while your time spent on the project would be limited. Hence you may have possibly gathered from the foregoing that we are not tickled to death over the prospect as outlined by you; but if, after you have come down to earth, you care to consider the proposition further, we will be glad to hear from you."

To which defendant, by letter of July 17th, rejoined:

"Your letter of the 12th inst. at hand. I understand from it that [for] what time your white help give the business there will be no charge, and [for the] time that I give the business there will be no charge; this is O. K. and agreeable to me. The mules, land, and what implements you have will be against my experience. All labor except that furnished by your white help, who, I understand, is your overseer and bookkeeper, will be charged for. I expect to spend the entire winter, from the 1st of October to the 1st of April, at your place."

On July 28th Warren Buckley acknowledged receipt of the foregoing and wrote (inter alia):

"My proposition you now understand, namely: That I shall furnish the land, mules, and ordinary field implements, as well as my time and what is required of my foreman, as against your time spent on the proposition, and will include a cottage for yourself, while on the place; all other personal expenses incurred by you to be borne by you, while we share equal expense of other labor, materials, and such expense, incurred in growing and handling the crop, not hereto included in the above arrangements. All expenses thus provided for shall be equally borne for (sic?) at time of payment, and will likewise equally divide the proceeds derived from the sale of plants grown. If these terms are acceptable to you, I believe your written acceptance of same will prove sufficient, as well as sufficiently flexible to allow of change in the future by mutual consent. I had not understood, from former correspondence and conversation, that it was your intention to spend the winter down here, but am glad to learn that such is the case."

And the correspondence was closed by the following, from defendant, under date of August 9th, to wit:

"Your letter of July 28th received. I will be down about the 1st of October. I have the seed—200 pounds—which will be used on the plant beds. I shall be there to do the sowing and planting; also the selling."

Defendant reached the plantation in due time; the ground had been prepared, the labor was furnished, and the seed were planted, all as per agreement; and then an advertising and promoting campaign was inaugurated, in which, in addition to defendant and Warren Buckley, several other persons, employed by defendant, participated. Circulars were composed, advertising the new concern, and were distributed among rural delivery mail carriers, express agents, and persons whose names were obtained from the books of the commercial agencies, all in the effort to build up what is considered the most valuable asset in the business, to wit, a mailing list. Defendant testifies that he brought with him 1,800 addressed envelopes, which were used in the distribution of advertising literature at that time; but Warren Buckley, who actively assisted in the distribution, testifies that he knew of no contribution of that kind, save a few (perhaps 200 or 300) letters, which, presumably, had been received from persons who had ordered plants from defendant before he came to Harlem.

Outside of the written agreement, as above set forth, there appears to have been an understanding to the effect that whatever money or material should be required for the business should be advanced by plaintiff, and charged to the account of the "cabbage plant business," on the books of Harlem Plantation, which necessitated the opening of such an account and led to the passing through it of all the cabbage plant business, with the exception of a certain highly important fac-

tor, to wit, the names of the customers and the amount of business done with each.

It appears from the evidence that, on February 10, 1915 (when this suit was instituted), the business was indebted to Buckley, for advances so made, in an amount approximating $3,000. It was almost exclusively a mail order business, and was conducted by defendant as follows: He received and opened the mail; turned over the orders to a young lady whom he had employed (and who had just left school and knew nothing of bookkeeping), by whom they were entered in a book that he kept for that purpose, and which, accurately kept, should show the names and addresses of the persons with whom the firm was dealing and the extent of the business done with each; the dates of the orders, when received, and when filled; the number and kinds of plants ordered; the amounts of the remittances therefor, and whether in cash, checks, or otherwise. The remittances were retained by defendant until they amounted to say $100, when they were handed over to Warren Buckley, who caused them to be entered to the credit of the cabbage plant account, in the Harlem books, and the order book, save when in use by the young lady, was also retained by defendant, who seems to have regarded it as his personal property, and to have been unwilling to allow it to go out of his possession, whether to be checked up with the account in the Harlem books, or to be audited by his copartner, or otherwise, though he, at one time, expressed such willingness, and, in his testimony, says that he was willing that it should be audited in his presence. There appears, also, to have been an understanding in regard to a cabbage plant business in which defendant was engaged (on Yonge's Island) at the time that he entered into the contract with plaintiff. Warren Buckley testifies that defendant gave him to understand that his Yonge's Island business would

deliver plants in a territory in which the Harlem business had no chance to compete; which lies to the eastward, and in which it is fostered by the Southern Express Company; that (according to the view of the witness) Mississippi and part of Tennessee and Kentucky might be considered neutral, because they are tapped by both the American and the Southern Express Companies, but that the lines were not specifically drawn because of defendant's assurance that the two businesses would not conflict in any manner. Defendant seems to admit that he gave that assurance, but refers, at one time, to the Atlantic seaboard as the territory in which the Southern Express Company operates, and in which, therefore, the cabbage plant business is done from Yonge's Island, and, at other times, to the territory west of the Mississippi river as that in which, alone, the Harlem concern was expected to operate. On the other hand, there is testimony to the effect that defendant stated that it was his intention to compete with the "William C. Geraty Company," composed of his mother and two brothers, and doing business on Yonge's Island, and there is no doubt that the Harlem concern and those on Yonge's Island were competing in the same territory, and that, whether the competition between defendant's firm, conducted in his name, by his wife and a Mr. Whaley, and the firm conducted in the same name at Harlem, in which plaintiff was interested as a partner, was conducted without prejudice to the latter, and undue favor to the former, depended on the good or bad faith on the part of defendant and of those by whom he was represented on Yonge's Island.

The business at Harlem during the season of 1913–1914 (beginning say October 1, 1913, and running into the month of April, 1914), showed a profit of about $1,600, without charging anything against it for the use of the land, or implements, or quarters occupied

by defendant, or for the services of either of the partners, or the overseer. And, during that period, defendant and Warren Buckley (for Chas. W. Buckley) discussed and reached an agreement, to be thereafter formulated in writing, to the effect that a corporation should be organized for the conduct of the wholesale trade, and another, or a limited partnership, for the handling of the retail trade, and there was some correspondence on that subject after defendant left Harlem, at the end, or before the end, of the season. Defendant also wrote to Warren Buckley, in June, from Yonge's Island, that he had been talking to a bookkeeper, who was about leaving the service of the William C. Geraty Company, and suggesting the idea that he be employed to keep the books of the firm of James Ray Geraty, at Harlem (though not in these words), and Warren Buckley replied that it would be perfectly satisfactory to him to have the person so suggested employed for that purpose. Defendant did not, however, succeed in getting the man whom he had mentioned, and, after his return to Harlem, Buckley suggested the name of a bookkeeper whom he and his father had known in Chicago, and, defendant expressing himself as satisfied therewith, Mr. R. H. Livingston was brought from Chicago, and instructed to inaugurate a proper system of bookkeeping for the cabbage plant business, and (a little later) to keep that business, in so far as the names of the patrons and their addresses were concerned, out of the Harlem account, and out of the Harlem bookkeeper's range of vision; and, in a general way, he was put in charge of the cabbage plant office, subject to the orders of defendant and Warren Buckley, and was expected to assist in the correspondence and otherwise, as his services might be found useful.

The charter of "the Geraty Wholesale Plant Company, Incorporated," had, in the meanwhile, been prepared, by John Dymond, Jr., and was signed by the parties (Warren Buckley, James Ray Geraty, and C. W. Buckley) on October 13, 1914, and there had also been prepared articles of copartnership in commendam, for the handling of the retail trade, in which Warren Buckley appeared as the partner in commendam and James Ray Geraty as the active partner, vested with sole authority to conduct the business; but those articles were not, then or afterwards, signed. By the terms of the charter each of the subscribers for the common stock (which was fixed at $5,000, divided equally between the two Buckleys, for $2,500, and defendant, for $2,500) was to pay the amount of his subscription in property, and it seems to have been understood that the property of the existing partnership was to be used by its members for that purpose; it being necessary that it should be appraised by the board of directors. Act No. 267 of 1914, § 3, p. 524.

About that time, or probably soon after the signing of the charter, defendant's brother, John W. Geraty, manager of the William C. Geraty Plant Company, of Yonge's Island, paid a visit to Harlem, and talked with defendant about the Harlem cabbage plant business, as also with Warren Buckley, with whom he likewise discussed some other business proposition. He says, in the testimony given by him in this case:

"In addition to our retail business, we are wholesale growers—contract growers—of cabbage plants, and we grow for the wholesale trade, men like H. G. Hastings, of Dallas, C. S. Reuter and Steckler's (of New Orleans), like the above concerns. To all of these people we make a contract growing price of 75 cents per 1,000, for plants grown and delivered to the transportation company, ready for shipment, when the plants are packed, with 1,000 or more to the package."

On November 27th following defendant wrote to the counsel by whom the charter of the Geraty Wholesale Plant Company had

been prepared (and who represents the plaintiff in the present suit) that the wording of the same, "Each stockholder shall have the privilege of casting one vote," was erroneous and should be amended to' read, "Each common share of stock shall have the privilege of casting one vote"; and on December 1st the counsel replied, saying:

"I shall examine the charter * * * to see the features that you mention * * * in regard to each stockholder having one vote, as the provision reads [referring, as we understand, to the original draft], for each share of stock · held by him." Perhaps in the printed copy the words "for each share of stock held by him" may have been omitted, "and I will have to look into it."

Defendant appears then (or perhaps had previously done so) to have employed an attorney, and there · were consultations in which plaintiff (through his representative) and Warren Buckley readily agreed that an error had been committed and that it should be corrected; but it was suggested that, inasmuch as the charter had been signed and published, it would be better to complete it, by having the board of directors approve the valuation of the property offered by way of subscription, and then amend it, all of which was fully explained to, and considered by, defendant and his legal adviser, and on December 19th the latter wrote to the attorney by whom the charter had been prepared, saying:

"Confirming my conversation with you over the phone, I beg to say that I have seen Mr. Geraty, and it would seem that the modifications of the charter are satisfactory to him, as well as the documents submitted. I therefore return the papers, in order that you may take the necessary steps looking to the consummation of the matter."

Among the papers in the possession of defendant's attorney at that time was a letter from the counsel who prepared the charter setting forth his view of the method to be adopted for its correction, and saying (inter alia):

"On behalf of Warren Buckley and Charles W. Buckley, the other incorporators, I will agree that section 5 of the organization shall be amended as above outlined, and as desired by Mr. Geraty."

Defendant appears to have understood that Warren Buckley had made an engagement with him to visit Yonge's Island in April, 1914, with a view of seeing something of the cabbage plant business, as there conducted, but the visit had not been paid; and, shortly before Christmas, the two Buckleys went there, upon the invitation of John W. Geraty, partly with a view of obtaining information about cabbage plants, and partly on other business. On December 29th defendant wrote to the attorney who had prepared the charter of the Geraty Wholesale Plant Company, saying:

"Mr. Warren Buckley will be home as soon as he can find time, and the writer will be in New Orleans to sign the papers for the Geraty Wholesale Plant Company"

—meaning, as we understand it, that he would then sign the papers conveying the property representing his subscription to the corporation. On January 21st he again wrote:

"I have to-day instructed Mr. Sam Henderson [the attorney whom he had employed] to take such action as may be necessary to prevent the formation of the Buckleys and myself in the Geraty Wholesale Plant Company, and will not be connected in business with them any longer than the term of the present year, and there will be no Geraty Wholesale Planting Company."

On January 27th he wrote as follows to C. W. Buckley (then in Chicago), to wit:

"After this season, I will not care to continue in business connections with Mr. Warren Buckley and Mr. Livingston; therefore I desire to have the charter of the Geraty Wholesale Plant Company annulled. Will it be agreeable to you, or will it be necessary that I take

legal steps to accomplish this? After the present season I will have no associate in the plant business, as I will get much better results under my own management than the present management existing."

To which C. W. Buckley replied (on January 30th):

"I have your favor of January 27th, which I have referred to Warren Buckley and Mr. Livingston, and as they are familiar with conditions there, I have left it to them to adjust. I do not regard it necessary to take any legal steps in this matter. With regards to yourself and family," etc.

Those who were at this end of the line, acting under advice, decided to complete, so far as they might be able, the formation of the Wholesale Company, as proposed, with a view, however, of thereafter amending the charter, and notices were issued to the members of the board of directors to meet on February 11, 1915 (for the purpose of appraising the property subscriptions). On February 9th there were assembled, in the office of the partnership, Mr. Warren Buckley with Mr. Livingston and three other employés, when defendant came in, bringing the mail, and Mr. Buckley handed him one of the notices thus mentioned, which he read, and thereupon indulged in an outburst of temper, following, or in the course of which there was a conversation between him and Warren Buckley, in which he announced his intention of removing the business to Yonge's Island, of stopping the delivery of the mail at Harlem (the post office being "Phœnix"), and requested Buckley to order a car for the transportation of his effects, and that was followed, on the same day, by an order, delivered by him to the postmistress at Phœnix, reading:

"Deliver mail for James Ray Geraty to no one except J. R. Geraty."

As there were five persons present, and they all agree that the language used conveyed the impression that it was defendant's intention to remove the entire business (conducted, as it was, in his name alone) to Yonge's Island, beyond the reach of interference from his partner, we find no reason to doubt that he so intended. On the following day (February 10th) plaintiff caused the receiver and liquidator to be appointed and the injunction to be issued; and, in that situation, the receiver and liquidator addressed a communication to defendant, reading:

"I hereby appoint you my agent to receive James Ray Geraty mail, to open the same and turn over to me, as receiver and liquidator of the James Ray Geraty copartnership, all inclosures of checks, orders, inquiries, or anything pertaining to the James Ray Geraty Company partnership cabbage plant business."

And on February 13th an order of court was obtained and served on defendant and on the assistant postmistress (in the absence of the postmistress) to the same effect, but specially authorizing defendant to assort the mail addressed to James Ray Geraty—

"and to turn over to the said * * * receiver any and all of said mail which pertains or belongs to the said * * * receiver of said partnership business of C. W. Buckley and James Ray Geraty * * * until further order," etc.

Defendant would not allow the messenger bearing the receiver's notice to communicate with him, so long as he could avoid it, and refrained from acting under it, or under the order of court, and, at the end of a week, went with his wife and child to Yonge's Island, where, and from which point, he seems to have done what he could to injure or destroy the business as carried on by the receiver, and for 45 days (until an order was obtained from the Post Office Department) no mail addressed to James Ray Geraty, at Phœnix post office, could be delivered, and the communications bearing that address, which were received there, were either re-

turned to the senders or sent to the dead letter office.

W. A. Bruce, manager of the Piedmont Plant Company (said to be the next largest cabbage plant dealer in this country), having been called by defendant, testified that he had given defendant an order for 10,000,000 plants, to be delivered in the season of 1914–1915, but that, though he wrote and wired to Phœnix, he was unable to get into communication with defendant, and did not get the plants; that, had he been informed that a receiver had been placed in charge of the business, he would have gone there in the hope of buying the plants, as he was greatly in need of them and could have sold many more. The weather, too, was unpropitious, as the receiver had been informed by defendant that the plants could not be shipped when wet, and there was a good deal of rain, and then a drouth.

Defendant seems to have changed his mental attitude towards the Harlem business and those connected with it, after his return in the late summer or fall of 1914, and after the visit to Harlem of his brother, John W. Geraty. Prior to that time, he was much interested and rather pressing in the matter of the organization of the "Geraty Wholesale Plant Company," through which he expressed the intention of competing with the William C. Geraty Plant Company, and the record is barren of complaints against the people by whom he was surrounded. He attributes his change of feeling to a variety of circumstances, which, he says, excited his resentment and distrust, to wit: The wording of the charter of the proposed corporation, whereby the Buckleys, being two to one against him, were to be placed in control; the assumption of authority by Livingston, supported by Warren Buckley, in writing letters to patrons which he disapproved, and which were injurious to the business; the action of Warren Buckley in attempting to surround him-self with employés whom he could control; and he makes other complaints which are either so vague as to be unintelligible, or, in the light of the testimony adduced, entirely unfounded in fact.

Defendant testifies that, in going to the office of the attorney for the discussion of the matter of the correction of the charter, he was accompanied by Warren Buckley, and that Buckley said to him that, "as he had succeeded in getting this advantage, there, and inserting those words in the charter, he did not think that I should object. That was a knocker to me; it hit me hard." Buckley testifies (in rebuttal) that he has no recollection of having made the statement attributed to him, and that his only opinion is that defendant's statement is "entirely false or the imaginings of a diseased brain."

His testimony (on cross-examination, when testifying originally) reads as follows:

"Q. Why did you put, or cause to be put, in that charter, that notwithstanding the fact that Mr. Geraty was to receive as many shares as you two put together, that, when it came to a vote, that you should vote according to the number of persons that held the stock, and not according to the number of shares owned by each person? (Objection and ruling.)

"By the witness: I would like to ask the permission of the court to be permitted to answer that question. That error was made in Mr. Dymond's office, in copying the information given him by Mr. Geraty and myself, and the minute that Mr. Geraty called my attention to that fact, I objected as strongly as Mr. Geraty.

"Q. Who did you object to? A. Mr. Dymond. Q. Why did you not go there and rectify it? A. Mr. Dymond said that it could not be done until after the completion of the charter, and I naturally asked [that it] then be corrected in this instance.

"Q. Did not Mr. Geraty tell you positively that he would not sign the charter until that was rectified? A. He objected to the clause, and I objected likewise. We therefore sent for Mr. Dymond, and he informed us that, due to this publication in the paper, this error could not be rectified until the organization was completed. We then agreed that we would rectify

it as soon as the charter was in a position for us to do so, and in Mr. Dymond's presence. * * *

"Q. Would you, as a business man, proceed to the consummation of a contract which was in direct contradiction to your own personal interests, and which could only be corrected by the consent of the people with whom you were doing business? A. Charles W. Buckley and myself were willing to bind ourselves in the matter, agreeably to Mr. James Ray Geraty, to accomplish this under proper procedure; but Mr. Geraty did not seem to think it necessary, as he seemed to take our word as good."

In regard to Mr. Livingston, it appears from the testimony, and is admitted, that defendant's first impressions of him were highly favorable; that is to say, he considered him a competent man for his position. Defendant had a difficulty with, and became bitterly hostile to, Mr. Kelly, who. kept the Harlem plantation books, and requested that he be discharged; but, though the matter out of which the trouble rose does not appear to have concerned the keeping of the books, and was one (as we infer) in which defendant antagonized at least two other persons about the place, it was arranged that Kelly should have nothing to do with the books of the cabbage plant business (of which Livingston took entire charge), and hence need not be brought in contact with defendant, who, upon that condition, consented that he be not discharged. There is no complaint of the manner in which Livingston kept the books of the cabbage plant business; but it appears that defendant had employed a young man as stenographer, who remained at Harlem during the Christmas holidays (1914), though he had announced his intention of spending that season in New Orleans; that Livingston, who had spent the holidays in Chicago, upon his return catechised the young man as to the manner in which he had occupied his time, and asked him, among other things, whether he had made a copy of the mailing list, to which the young man, with some hesitation, and a smile, replied in the

negative, and that he soon afterwards left the place. Defendant, in his answer, alleges that he—

"had employed other clerical help, which he considered sufficient, and more particularly one ———, against whom the said Warren Buckley, son and agent of plaintiff, made an accusation of dishonorable conduct, compelling the said ——— to resign, without any just cause or reason, except that the said Warren Buckley desired to surround himself with a force of men entirely under his control, as your respondent has since learned to his sorrow."

The young man thus referred to testified that he resigned of his own accord, because he saw no future for him in the cabbage plant business, and he wished to take a government examination. The facts pertinent to the foregoing allegations are that, of the six persons who, at different times, were in the office of the partnership at Harlem, all, save Livingston, were employed by defendant, and, if discharged during his stay there, were discharged by him, and Livingston, as we have seen, was employed with his approval, and after he had failed to exercise the privilege, which had readily been accorded him, of employing a bookkeeper of his own selection. It is true that the evidence, as we think, justifies the inference that Livingston suspected that the young man had made a copy of the mailing list, at defendant's request, to be used by defendant for some other purpose than the business of the partnership, and we conclude, from the allegations above quoted, that defendant conceived that impression from such information as was given him, which may account, or partially account, for his hostility to Livingston. But we find nothing in the record to justify the position which he here takes, that plaintiff, deliberately and against his wishes, forced upon him and retained an employé who was obnoxious to him and who assumed to oust him from the control of his own business. Warren Buckley testifies that defendant sug-

gested to him that, while he regarded Livingston as a competent man, he thought he was paid more ($100 per month) than the business could stand, but that he (Buckley) argued the question with him, and that defendant yielded the point, and we do not recall that defendant contradicted that statement.

It is shown that the partnership had a customer (W. B. McDonald) who complained that a certain shipment fell short 3,600 plants; that Livingston inquired into the matter, and, from the information that he obtained, reached the conclusion that the plants had been shipped, and that his complaint was unfounded, and prepared a letter to the customer, to which defendant objected, on the ground that the word of the consignee should be accepted and the shortage supplied; that he nevertheless took the letter, as if to mail it, but, as we infer, with the intention of inclosing it in a letter of apology, and of shipping the plants to make good the shortage. He seems, however, to have changed his mind, and to have inclosed something else with his letter to the customer, and to have sent Livingston's letter to C. W. Buckley, then in Chicago; his two letters, dated February 4 and 5, 1915, respectively, reading as follows:

Letter to C. W. B., February 4, 1914 (should be 1915):
"Dear Sir: I am inclosing you a sample of business courtesy that is being extended to the plant trade. It is just playing the devil with the business. I just have to take it out of the mail. I cannot stand it. You are different; you have money and can afford to let people play with something and give them a chance to make good. You lose the money; they don't lose their job. Well, with this dictatorial impression, you will have your agents lose about $2,000 this season for you in James Ray Geraty plant business."

Letter to Willie B. McDonald, February 4, 1914 (should be 1915):
"Dear Sir: I want to apologize for the general tone of letters you receive. I have connected with me some people from Chicago, this season, and they are hurting my business. Just write your complaints to J. R. Geraty, but address your letters to Mrs. Marie L. Geraty. I will always correct them. I shipped you the shortage, but there is no record in my office of the shipment. Sent same to Jonesboro."

In testifying concerning the matter thus referred to, defendant says:

"In fact he [Livingston] wrote a letter to Mr. McDonald, in which I considered he actually accused Mr. McDonald of dishonestly appropriating cabbage plants to himself, and I objected very seriously to that letter, and I even went so far as to write an additional letter, and put in there, trying to apologize to Mr. McDonald, stating that I was then in a position that I could not help myself," etc.

The facts at the bottom of the trouble were that defendant, who had entire charge of the field operations, had in his employ a negro boy to whom he left the shipment in question, and that he shipped 500 plants in packages which should have contained 1,000, a circumstance which may, and should, have been within the knowledge of defendant, but of which Livingston was necessarily ignorant.

The only other specific complaint that defendant makes in regard to letters relates to a case in which a patron (living in the same town with a seedsman who was a good customer) sent his personal check in payment for seed ordered. Livingston, upon inquiry, was informed by the seedsman that the patron was at least slow in paying, and defendant charges that he declined to accept the check, in which he was mistaken, as Livingston wrote that New Orleans exchange, or money orders, would be preferred, for the reason that the charges on out of town checks were "outrageous," but the check was not returned.

It is shown, beyond question, that when defendant was on the ground he received all the mail and opened it; that it was opened by Livingston only in his absence, and then by his authority. It is shown, to our satisfaction, that Livingston was subject to de-

fendant's orders, and recognized that fact, and it is not shown that he ever refused to obey any instructions that were given him by defendant, or that defendant ever complained of him, or made any suggestion concerning him, save upon one occasion when he said that, though competent, he was too expensive, which, after discussion with Warren Buckley, he waived. It appears to us that Mr. Livingston was at fault, not in expressing his opinions about the business when he was asked to do so, but in the manner of doing so, which was more blunt than tactful, and in his insisting upon them, in argument with a man whom he knew to be intolerant of opposition. He says, for instance, in his testimony, that he found, upon his arrival, that the way in which defendant and the young lady whom he had employed were attempting to keep a record of the business was crude and unsystematic; that the mailing list consisted of loose leaves, stuck on a file; that the names and addresses, which defendant had attempted to copy from letters, were largely unintelligible; that he asked defendant whether he had deliberately started out to make mistakes, and, upon his answering, "No," had said to him:

"Well, Mr. Geraty, it looks to me as if you spent your whole summer doing something that is of no value."

And it is quite evident that, though his intentions were good, he argued and discussed with defendant when it would have been better and more becoming if he had held his peace and done as he was told, all of which will be better understood from the following résumé of defendant's antecedents, as given by his brother, John W. Geraty, who was called as a witness in his behalf, and has given of his time and money to aid him in this case.

He testifies that their father, William C. Geraty, was the pioneer, on Yonge's Island, in the cabbage plant business, and that his three sons, John (himself), Charles, and James Ray (or "Ray," as defendant appears to have been called) were set to work in the cabbage plant beds at very early ages (say 6 years) and were given little or no education; that the father was a man of fixed opinions, and paid but little attention to the views of those who differed with him, and that his sons were like him in that respect; that, having attained considerable success, and acquired quite a large mercantile business, in addition to his cabbage plant business, he put the witness in charge of the financial and mercantile part, and his brother Charles in charge of the farming and stock interest, defendant (then a boy) being employed in one of the Geraty stores, of which the witness was in charge; that witness told defendant to polish the beam of a scale that stood upon the counter, and (quoting the testimony)—

"he declined to do it, and he says something to my father, and right from that they had some little difference, and Ray said he didn't have to take instructions from me, and he walked out, and he wouldn't say anything farther to my father; that he had made arrangements to go into the cabbage plant business, with which he was familiar. He knew the details, too; and, on account of him going into the cabbage plant business, why, my father then was very much provoked. * * * He thought that Ray, in going into the cabbage plant business, [was] working in direct opposition to the rest of the family in that business, and for that reason, he would not associate—"

The current of the testimony was switched off just then, but, taking it up further along, the story is that the father thereafter organized a corporation, composed of himself, his wife, and his sons Charles and John, to which he turned over all his property and business, dividing the stock among those mentioned, with a certain reservation for the benefit of his wife and himself, and dividing the management between the two sons, leaving defendant out, and that he also made a will from which defendant was excluded,

but which he was afterwards induced to alter, so that defendant may get something upon the death of his mother.

It appears that the witness, though actively assisting financially and otherwise, in the defense of this suit, is not disposed to make any further experiments in the way of associating defendant with him in business, as may be gathered from the following excerpt from his testimony:

"Q. Well, now, how does your brother, James Ray, get along with your brother Charles? A. He gets along all right, because he has never been associated in the business. From that to this day he has never been associated with our business in any way, shape, or form; from the day he walked out of our store, because he declined to polish the beam on the scale, and he has had no say in our business in any shape or form."

Defendant, after disagreeing with, and leaving, his father, became a rural mail carrier. He then entered into the truck farming and cabbage plant business with a partner, who furnished the capital, and within a few years the firm failed, leaving defendant considerably in debt. He then went into the cabbage plant business on his own account, on Yonge's Island, and seems to have done fairly well, since he is said to have paid the debts previously incurred and to have had some capital left, the whole of which he then lost, in two seasons of cabbage plant raising near Montgomery, Ala.; and it was after that experience that he called at Harlem plantation, his business at Yonge's Island having in the meanwhile been conducted by his wife ánd a Mr. Whaley, but, as we infer, with no brilliant success, and during the summer of 1914 he sold it to J. S. Stevens, with an agreement that Stevens should have the privilege of conducting it in the name of James Ray Geraty for three years.

When he left Harlem, in the spring of 1914, he carried with him the order book, which contained the names and addresses constituting the mailing list, which, by the united efforts of himself, Warren Buckley, and the office force, had been built up during the preceding season, and which is said to have contained 3,000 or more names. He was asked for the book on several occasions, and said that he had left it on Yonge's Island, but would write for it, which he did, and, when it was finally produced, it was shown to have been found in the possession of J. S. Stevens, to have borne a label indicating that it had been used, or intended to be used, in his business, and that it contained orders which appeared to have been directed to Harlem, but filled from his place at Yonge's Island, which phenomena defendant was unable to explain. In that connection, too, it is proper to say that on January 10, 1915, Mr. Livingston, having been called to the telephone, was informed that there was a telegram in the New Orleans office for "James Ray Geraty," and, that being the name of the firm for which he was working and neither of the members being present, he took the following message over the phone, to wit:

"Yonge's Island, S. C., Jan. 10, '15.
"James Ray Geraty, Phœnix, La.:
"Wire me quick if the 3,000 addressed envelopes should be sent out. Are they merchants or farmers? Am now nearly ready to mail my advertising matter.                    J. S. Stevens."

Defendant testifies that the list thus telegraphed about was not the list contained in the order book, but had been made up in the business which he had sold to Stevens; but it is not clear to us how it happened that he had addressed 3,000 envelopes for Stevens, and only 1,800 for the Harlem business, or by what rule he was governed in making the division.

He has shown throughout this case that he has not the faintest conception of the partnership relation, as determined by either the law merchant or the law of this state, and he is obsessed with the idea that he was

vested with absolute and undivided control of the business in which he was engaged in partnership with plaintiff, and that plaintiff had no right to be heard concerning its management in any department.

### Opinion.

[1] Plaintiff is suing for the liquidation of a partnership, which is inconsistent with any theory of a merger of the partnership into a corporation, and defendant denies that any corporation was formed. We therefore regard that question as eliminated, and deal with the case solely as a proceeding for the liquidation of a partnership.

The record discloses nothing in the conduct of the partnership business, proper, which warranted the threat made by defendant to remove the business to Yonge's Island, and to have the mail orders, which constituted its life blood, sent there; but he insisted upon it that he would pursue that course, though the suggestion was made to him that it would be better to go on with the partnership, until the end of the season, even though he should persist in abandoning the idea of the corporation.

It is said by defendant's learned counsel that—

"Even assuming that he did make those threats, it would have been evident to almost any one that he meant nothing by them, considering the excitement and tension under which he was laboring."

It is beyond dispute, however, that defendant immediately carried his threat into execution to the extent of stopping the delivery of the mail, which, for a time, stopped the entire business, and resulted in the permanent loss of so much of it as was represented by the orders that were never delivered, and by the customers whose orders, having been returned to them or sent to the dead letter office, would be likely to send no more, and equally beyond dispute that, during 45 days, he would neither take out the mail himself, nor consent that any one else should do so, and that he did what he could to discourage patronage of the Harlem business, if not to divert it to Yonge's Island. Apart from that, the fact that, 14 years before, defendant had quarreled with his father and brother, had walked out of their store, and had never, thereafter, been associated with them, or after the death of his father, with his mother and brothers, in the leading business of that kind in this country, would seem to indicate, either that he is not easily swerved from a course to which he once commits himself, or else that his temperament is such that he is regarded by those to whom he is best known as an undesirable business associate. The error in the proposed charter of the Geraty Wholesale Plant Company was unfortunate, in that, until explained, it was likely to excite uneasiness, if not distrust, in the mind of the ordinary business man, and more likely, as we imagine, to affect in that way a person constituted as defendant seems to be. The explanation of the error, and the ready assurance that it would be corrected, would no doubt have been satisfactory to the ordinary mind, and it seems to have been so to defendant, for the time being. We infer that, upon further reflection defendant's legal adviser, and defendant himself, became dubious as to the manner in which it was proposed that the correction should be made, and, whilst it would appear to have been less expensive than to have started over again, and likely to have been as effective in the result, we rather doubt the propriety of the attempt to force it through over defendant's objection.

Defendant was, however, at liberty to refuse, as he did, to go further upon the lines thus selected, and the courts were open to him, if the action which had been taken had thereafter been used as a basis for an interference with his rights in the partnership business, to show that according to the

frank admission of the parties themselves the charter which they had signed, and into which he was asked to proceed, did not represent the contract into which they had intended to enter; but he was not at liberty to remove the partnership business from the place at which it had been established to another place, in another state, nor thus to put an end to, or obstruct, its operations. We therefore conclude that plaintiff was justified in meeting his threat and his action in that direction by an injunction and a demand for the liquidation of the partnership. Constitution, art. 109; C. C. art. 2856, and article 2870, subd. 2, and articles 2876, 2888; C. P. art. 298, subd. 8, and article 303; Borah v. O'Niell, 116 La. 672, 41 South. 29; Levine v. Michel, 35 La. Ann. 1121. There remains the question of the ex parte appointment of the receiver and liquidator.

That question was not presented by the pleading, nor was it referred to at any time during the protracted trial, but was raised for the first time in the argument, several months later, and it was then objected that it came too late, that defendant was estopped, and the objection was sustained, on the ground (quoting) that "neither the pleadings nor the evidence discloses any objection to the appointment of a receiver."

[2] We agree with the learned trial judge that, after filing an elaborate answer, and trying, upon its merits, the question whether the "receiver and liquidator" was properly appointed, it was too late for defendant to make the objection that he had not been cited and given a hearing before the appointment was made.

On the merits, the judgment appealed from goes no further than to perpetuate the injunction, confirm the appointment of the receiver and liquidator, and reject the demand, in reconvention, set up by defendant, reserving the question of costs for future action.

145 La.—31

We find no sufficient reason for disturbing the judgment as rendered, but, in view of the fact that this litigation is attributable to fault on the part of both litigants, we are of opinion that the costs of the appeal should be borne by them in equal proportions.

It is therefore ordered and decreed that the judgment appealed from be affirmed, that the costs of this appeal be paid by plaintiff and defendant in the proportions of one-half by each, and that the costs of the district court await the liquidation of their partnership and the final judgment to be rendered therein.